UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

*FILED*

DEC 19 2008

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By _____
Deputy Clerk

| | | |
|---|---|---|
| 1. COMPSOURCE OKLAHOMA, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*, | §<br>§<br>§<br>§<br>§<br>§ | |
| v. | §<br>§<br>§<br>§ | Case No. **CIV** 0 8 - 4 6 9 - K E W |
| 1. BNY MELLON, N.A. and<br>2. THE BANK OF NEW YORK MELLON CORPORATION,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§ | JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff CompSource Oklahoma ("Plaintiff" or "CompSource"), individually and on behalf of all others similarly situated, files this Class Action Complaint against Defendant BNY Mellon, N.A. ("BNY Mellon") and The Bank of New York Mellon Corporation ("BNYM Corp." and, collectively with BNY Mellon, the "Defendants"), and alleges as follows:[1]

## I.   SUMMARY OF THE ACTION

1.     Plaintiff brings this action on behalf of the Class (as that term is defined in Paragraph 82), which consists of all participants in Defendants' securities lending program who, through one or more of the collective investment vehicles managed by Defendants or their affiliates, incurred losses relating to investments in medium-term notes of Sigma Finance, Inc.

---

[1] Plaintiff's allegations are based upon information and belief, except as to those allegations concerning Plaintiff, which are based upon personal knowledge.

2.      Each member of the Class ("Class Member"), including Plaintiff, was a party to a securities lending agreement ("Securities Lending Agreement") with one of the Defendants. Pursuant to these Securities Lending Agreements, Defendants loaned securities owned by Class Members to third-party borrowers in return for cash collateral. Defendants then invested, at their sole discretion, the cash collateral in an effort to earn an investment return on the cash collateral in excess of the rebate paid to the third-party borrowers. In return, Defendants received as compensation a percentage of the revenues generated for each Class Member. Defendants refer to these activities as the "Securities Lending Program."

3.      Because the funds Defendants invested for Class Members consisted of collateral that must be returned to borrowers upon repayment of the underlying securities loans, the Securities Lending Agreements required Defendants to, *inter alia*, (a) safeguard principal, (b) maintain adequate liquidity, and (c) discharge their duties with respect to the investment of the collateral with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

4.      Despite these objectives and duties, Defendants invested, and ultimately lost, a substantial portion of the cash collateral provided to Class Members in medium-term notes ("MTNs") issued by Sigma Finance, Inc. ("SFI"). SFI is a Delaware corporation organized for the sole purpose of issuing debt securities for its Cayman Islands parent company, Sigma Finance Corporation ("Sigma"). The debt securities—in

2

this case MTNs--were secured only by a "floating lien" on the assets of Sigma, which was subject to subordination to the lien interests of Sigma's other creditors.

5.      Shortly after Defendants purchased hundreds of millions of Sigma MTNs using the cash collateral held by Class Members, analysts following Sigma and other structured investment vehicles ("SIVs") like Sigma warned that the lack of liquidity in the credit market and sharp declines in the market value of assets backing many SIVs threatened their viability.

6.      By December 2007, analysts predicted that Sigma would not be able to repay the MTNs Defendants purchased with Class Members' collateral upon maturity. Instead of acting reasonably and prudently by selling Sigma's securities at that time, Defendants wholly ignored these reports and continued to hold these investments.

7.      The news continued to worsen for Sigma in January 2008 and the months that followed. Still, Defendants buried their heads in the sand and refused to liquidate the MTNs.

8.      The analyst predictions ultimately proved true as Sigma's creditors seized over $25 billion of its approximately $27 billion of assets in late September and early October 2008, leaving approximately $1.9 billion as security for approximately $6.2 billion of outstanding MTNs and other secured debt. By October 6, 2008, Sigma was in receivership.

9.      Defendants' refusal to sell the MTNs before this collapse—despite the warning that such a collapse was imminent—constitutes negligence, a breach of fiduciary duty, and a breach of their obligations under the Securities Lending Agreements. As a direct, proximate and producing result of Defendants' conduct, Plaintiff suffered a loss of

3

over \$4 million; similarly, other Class Members also suffered significant losses collectively totaling hundreds of millions of dollars.

10. Accordingly, Plaintiff brings this action on behalf of itself and all Class Members to recover monetary damages to compensate for these losses and disgorgement of the fees Defendants earned in connection with the Securities Lending Program.

## II. PARTIES

11. Plaintiff CompSource Oklahoma is a state entity created under the laws of the State of Oklahoma. CompSource is a non-profit, self-supporting and self-sustaining workers compensation insurance company created by the State of Oklahoma in 1933. In 2001, The State Insurance Fund of the State of Oklahoma changed its name to CompSource Oklahoma by virtue of OKLA. STAT. tit. 85, § 131. CompSource operates based on investment income and premiums generated from its more than 29,000 policyholders located across the State of Oklahoma. Throughout this Complaint, the term "Plaintiff" will be used to refer to CompSource Oklahoma both prior and subsequent to its name change.

12. Defendant BNY Mellon, N.A. ("BNY Mellon") is a national banking association organized and existing under the laws of the United States. Defendant BNY Mellon's principal place of business is in Pittsburgh, Pennsylvania. Defendant BNY Mellon is the securities lending agent for Plaintiff and all Class Members. Defendant BNY Mellon managed the investment of cash collateral at issue in this case. Defendant BNY Mellon is the successor by operation of law to Mellon Bank, N.A, the entity that executed the Securities Lending Agreement with Plaintiff and other Class Members. Throughout this Complaint, references to Defendant BNY Mellon refer to both

4

Defendant BNY Mellon and its predecessor, Mellon Bank, N.A. Defendant BNY Mellon may be served with process through any of its officers or directors, including Robert P. Kelly, Chairman and Chief Executive Officer, One Wall Street, New York, New York 10286 and Carl Krasik, General Counsel, One Wall Street, New York, New York 10286.

13.     Defendant The Bank of New York Mellon Corporation ("BNYM Corp.") is a national banking corporation organized and existing under the laws of the State of Delaware. Defendant BNYM Corp.'s principal place of business is in New York City, New York. By at least July 1, 2008, the asset servicing business and operations of Mellon Bank, N.A. (now, Defendant BNY Mellon) were consolidated into Defendant BNYM Corp. After July 1, 2008, Defendant BNYM Corp., through its division called BNY Mellon Asset Servicing, managed the investment of cash collateral at issue in this case. Defendant BNYM Corp. may be served with process through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

## III.   JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(d)(2). The amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and this is a class action in which at least one member of the class is a citizen of a state different from any defendant.

15.     This Court has both specific and general jurisdiction over Defendants. Defendants engage in continuous and systematic activities within the State of Oklahoma. These activities include, but are not limited to, entering into and performing multiple

agreements with Plaintiff, one of which is the subject of Plaintiff's causes of action alleged herein.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Specifically, as provided by 28 U.S.C. §1391(c), Defendants are corporations that are deemed to reside in this District. Moreover, CompSource is comprised of over 9,000 policy holders, many of whom are located in and employ workers who work and/or reside in this District.

## IV.   FACTS

### A.     Defendants' Securities Lending Agreements

17.     Pursuant to the Securities Lending Agreements with Plaintiff and other Class Members, Defendants loaned securities held by Plaintiff and Class Members to third-party borrowers—typically, those seeking to short sell the securities.

18.     In return for the loaned securities, Plaintiff and Class Members received from the borrowers cash collateral in an amount exceeding the market value of the loaned securities.

19.     Defendants then commingled this cash collateral in one or more collective investment vehicles that Defendants created and maintained and for which they served as the investment manager. For example, as of the end of September 2008, the cash collateral received by Plaintiff made up approximately 1.06% of the total commingled funds in Defendants' Mellon GSL DBT II Collateral Fund (the "GSL DBT II Fund").

20.     Through these collective investment vehicles, Defendants invested the cash collateral received by Plaintiff and other Class Members in the Securities Lending Program.

6

21.     Pursuant to the Securities Lending Agreements, Plaintiff and other Class Members were to receive a pro rata share of revenues earned by the collective investment vehicles in which their cash collateral was invested, less the expenses and fees taken by Defendants and the rebate paid to the borrowers of the Class Members' securities.

22.     Defendants received, as compensation for their services, a percentage of the net revenues generated through the Securities Lending Program for each Class Member.

**B.     Objectives and Guidelines for Investment of Collateral**

23.     Because Defendants invested cash collateral—essentially, borrowed money—that had to be returned to the borrowers of the securities upon return of those securities—Defendants were contractually required to invest the cash collateral conservatively and prudently, consistent with the principal objective of the Securities Lending Agreements of safeguarding principal.

24.     In particular, the Securities Lending Agreements and/or the collective investment vehicles through which the collateral was invested required Defendants to follow certain guidelines and/or policies in the investment of the cash collateral (the "Investment Guidelines").

25.     The Investment Guidelines define the following "key objectives" for the management of the cash collateral supporting securities loans:

- safeguard principal,
- assure that all cash collateral is invested in a timely manner,
- maintain a diversified portfolio of investments,
- maintain adequate liquidity to meet the anticipated needs of clients and/or their investment advisors, and
- consistent with these objectives, to optimize the spread between the collateral earnings and the rebate paid to the borrower of securities.

7

### C.    Standard of Care Undertaken by Defendants

26.    Through the Securities Lending Agreements and/or other agreements governing the relationship between Defendants and Class Members, Defendants also undertook to manage the investment of Class Members' cash collateral: (a) solely in the interest of Class Members, (b) for the exclusive purpose of providing benefits to Class Members, (c) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (d) in accordance with the documents and instruments governing its contract with Class Members.

27.    These duties are commonly referred to as the duties of loyalty, exclusive purpose and prudence. They are the highest known to the law. The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. The duty of prudence requires, among other things, that Defendants (a) conduct an independent and thorough investigation into, and continually to monitor, the merits and prudence of the investments its makes; and (b) convey complete and accurate information material to the circumstances and correct inaccurate or misleading information.

28.    Additionally, Defendants owed a duty to Class Members under the Securities Lending Agreements to not act negligently—that is, a duty of care to not cause harm or injury to Plaintiff and other Class Members. Pursuant to the Securities Lending Agreements, Defendants expressly assumed liability for any losses resulting from its negligence in the Securities Lending Program.

### D.    Defendants' Investment of Cash Collateral

8

29.     Since as early as January 2007, Defendants invested billions of dollars of cash received as collateral for loans of Class Members' securities.

30.     Defendants invested the cash collateral through collective investment vehicles including, without limitation, the GSL DBT II Fund. Defendants acted as the investment manager for all such vehicles.

31.     Through these collective investment vehicles, Defendants used the cash collateral received by Class Members to purchase the MTNs of SFI. For example, between January and the end of May 2007, Defendants purchased over $404 million of the SFI-issued MTNs through the GSL DBT II Fund.

32.     SFI, a Delaware corporation, is the wholly owned subsidiary of Sigma Finance Corporation ("Sigma"), an entity organized and existing under the laws of the Cayman Islands. SFI was organized for the sole purpose of issuing and selling debt securities as a nominee for Sigma. SFI is not permitted by its certificate of incorporation to engage in any other business.

33.     The MTNs issued by SFI are guaranteed by Sigma and secured by a "first priority floating lien" in the assets of Sigma, except with respect to assets used as collateral for repurchase agreements ("repo transactions")[2] or other borrowing arrangements (subject to the funds raised thereby being at least equal to 90% of the then current market value of such assets) in which case the lien will rank second in respect of such assets.

---

[2] In a repo transaction, the SIV sells a portion of its assets to a "repo counterparty," typically a bank with the highest possible short term rating. At the same time, the SIV agrees to repurchase the assets at a specific point in the future (the repo term) and pays interest to the repo counterparty over the term of the transaction. To protect itself from default by the SIV, the repo counterparty insists on a "haircut" being applied to assets. This means that the SIV must post collateral valued in excess of the amount the SIV borrows from the repo counterparty.

34.     Sigma is a structured investment vehicle ("SIV") managed by the British firm Gordian Knot Limited.

35.     SIVs issue short term debt, typically in the form of MTNs and commercial paper, to finance the acquisition of long term high yielding assets, such as mortgage backed securities, earning revenues based on the difference in yield between the debt it issues and the investment assets its owns.

36.     During the summer of 2007, Sigma was the largest of approximately 30 SIVs in the world. As of July 2007, Sigma had outstanding debt of approximately $52 billion.

**E.      The Unmistakable—Yet Unheeded—Warnings Concerning Sigma**

37.     As early as August 2007, just a few months after Defendants invested hundreds of millions of Class Members' cash collateral in the Sigma MTNs, analysts sounded alarm bells for the health of SIVs. For example, according to Citi analysts, liquidity in the credit markets and sharp declines in the market value of assets backing many SIVs had already caused forced selling of assets among the world's major SIVs to support their revolving debt.

38.     On June 21, 2007, two hedge funds, created and managed by a subsidiary of the former investment bank Bear Stearns & Co., whose investment strategy relied on financing its investment activities by borrowing against long term assets like mortgage backed securities, faced a liquidity crisis as the hedge funds' lenders were reluctant to lend money to an entity whose collateral was principally based on mortgage backed securities. These hedge funds had to be bailed out by their parent, Bear Stearns, and in August 2007, they were shut down.

39.     The collapse of the Bear Stearns hedge funds fueled a liquidity crisis among SIVs that held assets similar to these hedge funds. Between August and October 2007, more than a dozen SIVs failed following downgrades by rating agencies over the quality of their assets.

40.     As a Citi analyst who tracked SIVs stated in a report dated September 14, 2007, "U.S. subprime related problems have brought the global securitized products market to a standstill, and the liquidity has dried up, but selling into distressed markets seems the worst option and last resort. The re-pricing is unprecedented." *See* Birgit Specht, What Really Backs ABCP Or Should it Be Who? Citi Research Report at 3 (Sept. 14, 2007).

41.     Of the many SIVs that failed, the bulk were subsidiaries of, or had been set up by, major banks. As such, these banks—including Citigroup and HSBC— essentially absorbed their failures.

42.     Sigma, however, was unique in that it was a standalone entity and had no investment or commercial bank backing it. Nevertheless, while many of the smaller SIVs were collapsing in the fall of 2007, Sigma barely managed to stay alive during this period because it had a large asset base that could be sold as its debt obligations matured, much of its outstanding debt was in the form of MTNs maturing in 2008, and it had eliminated market-value triggers from its governance that forced the other failing SIVs (who had not eliminated these provisions) to sell their assets and wind down in 2007 as the values of their underlying assets declined. *See* Neil Unmack, Pioneers of Structured Investments Fight for Survival of Flagship Fund, *Bloomberg News* (Apr. 8, 2008). Sigma removed these triggers in 2003 because its founders recognized that falling prices of the securities

11

held by Sigma was a "contagion risk" that could infect and threaten the viability of Sigma. However, the removal of these triggers simply prolonged Sigma's death.

43.     Faced with an inability to issue new MTNs or commercial paper, Sigma was forced to finance its activities using repo transactions which encumbered an overwhelming majority—approximately $25 billion—of its $27 billion in assets to the detriment of Class Members (whose security interests were subordinated to the security interests of the repurchase agreement counterparties). Sigma's survival was contingent on these repo counterparties continuing to lend money to Sigma collateralized against Sigma's existing asset base. This was, however, a temporary survival strategy.

44.     As the *Financial Times* wrote on December 17, 2007, Sigma, despite weathering the first SIV liquidity storm, was certain to be caught up in a second liquidity storm when its MTNs came due:

> The funding problems for the structured investment vehicles (SIVs) that have been at the centre of this year's liquidity troubles are far from over in spite of a number of banks stepping in to support their vehicles. **January will bring the start of a second wave of liquidity problems for SIVs as the vast majority of medium-term funding starts to come due for repayment**, according to a report from Dresdner Kleinwort analysts to be published on Wednesday. SIVs rely on cheap, short-term debt to fund investments in longer-term, higher-yielding securities. **They have been hurt as funding has dried up and asset values have declined**. This cheap debt has come from both the very short-term commercial paper (CP) markets and from the slightly longer maturity medium-term note (MTN) markets. CP funding has long dried up and much of what was sold has matured . . . **According to the DrK analysts' calculations, two-thirds of all MTN funding for SIVs comes due for repayment by the end of next September. Almost $40bn is to be repaid from January to March alone. This second liquidity squeeze will affect some SIVs more than others. Sigma Finance, run by Gordian Knot, accounts for 22.5 per cent of all outstanding MTNs issued by SIVs. It must repay about $22.5bn by the end of September and another $2.5bn in the final quarter.**

12

*See* Paul J. Davis, Second Wave of SIV Liquidity Problems Looms, FT.com (Dec. 17, 2007) (emphasis added).

45.     Thus, clearly, by as early as December 2007, analysts were predicting that Sigma would face a liquidity crisis by at least the end of September 2008.

46.     In a January 25, 2008 report, a Citi analyst echoed the sentiment of Sigma's impending failure, noting that Sigma had not secured the financing it would need to survive:

> [T]he largest unknown factor seems to be Gordian Knot, not only the largest but also the only non-bank sponsored SIV still looking to secure support. While initially in a better position due to its longer-term debt profile . . . 60% of the total MTNs will mature in 2008, one-third in the first quarter. Moody's has told us that Gordian Knot seems close to securing funding, but nothing has been confirmed to date. The worsening climate in markets does not help, we think.

*See* Birgit Specht, European Securitized Products Outlook 2008, Citi European Securitised Products Strategy & Analysis (Jan. 25, 2008).

47.     Given the reports concerning numerous failures of SIVs in general, and more specifically, Sigma's inability to secure the financing it would need to survive beyond September 2008, Defendants knew or should have known the dire financial conditions facing Sigma at least by the end of January 2008.

48.     This is especially true where, as here, Defendants claimed that their "team of credit research analysts monitors approved issuers on a daily basis in an effort to maintain credit quality and anticipate potential downgrades. … This process enhances our ability to take immediate action to … recommend selling an investment, if appropriate." Defendants touted their "bottom-up analysis of all investment issuers" and "rigorous oversight" by at least four committees meeting as often as bi-weekly.

13

49. Thus, given the reported financial conditions facing Sigma and Defendants' self-proclaimed "rigorous oversight" on a "daily basis," Defendants should have known they needed to liquidate Plaintiff's and the Class Members' positions in Sigma by at least January 31, 2008. Certainly, such action was required by the duties Defendants assumed under the agreements with Class Members. A prudent person acting with care, skill, prudence, and diligence under the circumstances then prevailing and familiar with these issues would have liquidated the Sigma positions by at least January 31, 2008, if not earlier.

50. As evidenced by Defendants' Global Securities Lending Holdings Reports, there was an active secondary market for the sale of the Sigma MTNs.

51. Had Defendants properly discharged their fiduciary duties by January 31, 2008, they would have incurred a loss of less than 2% of the amortized price of the Sigma MTNs for all Class Members.

52. For example, had Defendants liquidated the Sigma MTNs held by the GSL DBT II Fund on January 31, 2008, the total realized loss for that fund on the Sigma MTNs would have been only $7.09 million (1.75% of amortized price), as opposed to $360.60 million (94.6% of amortized price) as of October 31, 2008, a mere nine months later.[3]

53. The following chart illustrates the unrealized losses relating to the Sigma MTNs held by the GSL DBT II Fund between September 2007 and October 2008.

---

[3] All calculations of unrealized losses relating to the Sigma MTNs are based on the Market Value reported in the monthly DBT II Global Securities Lending Holdings Report.

14



### F.   Negative Predictions for Sigma Continue

54.   As forecasted in prior months, the circumstances continued to deteriorate for Sigma after January 2008.

55.   In February 2008, a Citi analyst wrote, "Sigma, the largest (non-bank managed) SIV appears to be the only one left yet to secure support.  On February 27, Moody's put Sigma's CP/MTNs on review for downgrade."   The report continued: "Moody's decision to finally place its senior debt ratings on Watch Negative has been based on its liquidity situation and current market valuations.  The risk has been looming for weeks."  *See* Birgit Specht, European Securitized Products Strategy, Citi European Securitized Products Strategy & Analysis, Feb. 29, 2008, at 5 and 6.

56.   Also in February 2008, the *Financial Times* reported, "Most other large SIVs are run by big banks, which have now stepped in to support their vehicles.  The lack

15

of a large bank behind Sigma leaves it vulnerable to collapse." *See* Paul J. Davis, Moody's to review Sigma rating, FT.com, Feb. 27, 2008.

57.     By at least March 19, 2008, as Bloomberg later reported, Sigma acknowledged that its ability to sell commercial paper had "diminished significantly."

58.     Days later, S&P issued a warning that Sigma's senior debt would be downgraded. In a March 28, 2008 report, commenting on this development, a Citi analyst expressed further concern over Sigma's viability. The analyst noted that the SIV was using asset sales to cover its maturing short-term debt and increasingly resorting to "repo transactions" for financing purposes. According to the analyst, "Sigma is the only remaining SIV not to have secured support . . . asset prices have continued to decline, and SIVs continue to sell assets to meet maturing liabilities. . . .  The use of repo poses significant risk to other senior creditors . . . In the event of Sigma defaulting, the repo counterparty can seize these assets and sell them off at its discretion, only needing to cover the amount it is owned." *See* Birgit Specht, European Securitized Products Outlook 2008, Citi European Securitised Products Strategy & Analysis, at 6 (Mar. 28, 2008).

59.     Despite this grim outlook for Sigma, Defendants did nothing to safeguard Plaintiff's and Class Members' principal.

60.     The news only got worse. On April 4, 2008, both Moody's and S&P downgraded the MTNs issued by Sigma and held by the GSL DBT II Fund.

61.     On April 8, 2008, Bloomberg News explained the ratings agencies' downgrades were precipitated by the bleak prospect that Sigma could secure the funding it needed to remain viable:

16

> Gordian's Sigma Finance Corp. must refinance $20 billion of debt by September in a market where even the biggest banks are struggling to borrow, according to Moody's Investor Service. Moody's cut the $40 billion fund's Aaa rating by five levels to A2 last week because of concern about Sigma's ability to weather the credit crunch. Standard & Poor's downgraded Sigma on Monday to AA- from AAA. The inability to replace the debt may cause Sigma to dissolve.
>
> [Sigma] ... has dodged the turmoil by finding financing alternatives after demand for the industry's primary source of cash, commercial paper, dried up. A failure would signal a credit market freeze that began in July [2007] and led to the collapse of Bear Stearns isn't close to ending ....

*See* Neil Unmack, Pioneers of Structured Investments Fight for Survival of Flagship Fund, Bloomberg News (Apr. 8, 2008). The report also noted that by April 2008, money market funds had already reduced their investments in Sigma and rolled new money into more conservative programs. *See id.*

62.     As a consequence of the downgrades, the GSL DBT II Fund's unrealized losses were approximately $124.5 million, or approximately 30.8% of the amortized price of these securities. *See* DBT II Global Securities Lending Holdings Report, as of April 30, 2008.

63.     As Bloomberg reported, Sigma turned to $26 billion in repo financing to temporarily survive and sold assets to repay maturing debt, shrinking to $40 billion from a peak of $57 billion. The report cautioned, however, that while the repo arrangements "may" provide financing through June, some of the transactions had not yet been completed. *See* Neil Unmack, Pioneers of Structured Investments Fight for Survival of Flagship Fund, Bloomberg News (Apr. 8, 2008).

64.     Through the summer of 2007, within the analyst community and in the press, the alarms continued to sound about the financial troubles facing Sigma.

17

65.     In July 2008, the Citi analyst that had been following Sigma echoed his warnings about Sigma's use of repo financing and asset sales to make up for shortfalls in financing. He noted, "Sigma's repo funding looks to be the greatest threat to senior creditors – and other investors in AAA ABS and bank floaters. If Sigma were to enter into enforcement/default on its debt, the repo counterparties would effectively rank ahead of senior noteholders. Banks would most likely sell the assets immediately, with discounts potentially extinguishing the equity, and perhaps even more." *See* Birgit Specht, An Update on SIVs, European Fixed Income Strategy and Analysis, (Jul. 1 2008). As with the prior negative news, Defendants ignored this information. Only a couple months later, the Citi analyst's warnings materialized.

## G.     Analysts' Predictions Come True

66.     As predicted as early as fall of 2007, Sigma failed.

67.     On September 29, 2008, JP Morgan, one of Sigma's repo counterparties, terminated its repurchase agreement and served Sigma with a notice of default when Sigma could not provide sufficient collateral to JP Morgan in response to a margin call (prompted by a decline in value of the securities JP Morgan held as collateral).

68.     Following JP Morgan, HSBC Holdings PLC and Royal Bank of Scotland Group PLC also terminated their repurchase agreements.

69.     As a result, these lenders seized the assets they held under the repurchase agreements. The defaults allowed Sigma's repo counterparties to sell the securities they held pursuant to the repo agreements.

70.     On September 30, 2008, Moody's and S&P downgraded Sigma on this news and warned that investors in roughly $6 billion of Sigma's remaining debt (which included the MTNs) may not get their money back.

71.     At the time of this default, of Sigma's approximately $27 billion in face value of assets, approximately $25 billion had been seized as repo collateral which left approximately $1.9 billion in face value of unencumbered assets backing approximately $6.2 billion in outstanding senior secured liabilities (primarily MTNs).

72.     As of September 30, 2008, the MTNs held by the collective investment vehicles had lost approximately 85% of their value.  For example, the MTNs held by the GSL DBT II Fund had lost approximately $324.1 million, or 85% of their value.  As of the prior day (before the default), the Sigma MTNs comprised 2.37% of the value of the GSL DBT II Fund.

73.     On October 1, 2008, Defendants notified Plaintiff and other Class Members that the Sigma MTNs held by the collective investment vehicles, including the GSL DBT II Fund, were transferred into liquidating trusts.

74.     On October 1, 2008, Sigma announced it ceased trading and expected that a receiver would be appointed.

75.     By October 6, 2008, three receivers were appointed to wind up the affairs of Sigma.

76.     On or about October 6, 2008, Defendants notified Plaintiff and other Class Members of the Class' exposure to the Sigma MTNs.  Defendants notified Plaintiff that its exposure (amortized cost) to Sigma was $4,084,569.94, which represented 1.06% of the exposure of the Class Members participating in the GSL DBT II Fund.

19

77.     On or about December 2, 2008, the receivers held an auction sale of Sigma's securities Portfolio and sold the securities for $306 million. The receivers estimated that Sigma's obligation to MTN holders was approximately $6.2 billion and that MTNs maturing after October 23, 2008 will not be satisfied from any such proceeds.

78.     Each of the Sigma MTNs held in the GSL DBT II Fund as of September 30, 2008 matured after October 23, 2008, and will not participate in any of the auction proceeds.

79.     While announcing only weeks earlier that Defendant BNYM Corp. would provide support to its clients for losses suffered in connection with Lehman Brothers investments at an after-tax cost of $425 million, Defendants refused to provide any support for the losses associated with the Sigma MTNs.

80.     Defendants have made no effort to remedy the losses for which they are contractually liable under the Securities Agreements. Instead, Defendant BNYM Corp. continues to reap the benefits of the Securities Lending Agreements, recording third quarter revenue of $155 million from its Securities Lending Program.

## V.     CLASS ALLEGATIONS

81.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class defined as follows:

> All persons and entities who, pursuant to a securities lending agreement with Defendant(s), held one or more unit interests in a collective investment vehicle that was managed by one or both Defendants or any of their affiliates and that held one or more debt securities of Sigma Finance, Inc. as of the close of business on September 30, 2008 (the "Class"). Excluded from the Class are (i) Defendants; (ii) all officers, directors, principals, and partners of Defendants and of Defendants' parents, subsidiaries, or affiliates, at all relevant times; (iii) members of the immediate family of any of the foregoing excluded parties; (iv) the legal representatives, heirs, successors, and assigns of any of the foregoing

excluded parties; and (v) any entity in which any of the foregoing excluded parties has or had a controlling interest.

82.     The members of the Class are so numerous that joinder of all members is impracticable.

83.     Plaintiff's claims are typical of the claims of all Class Members, as all Class Members are similarly affected by Defendants' uniform wrongful conduct and their claims are based on such conduct.

84.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class, complex commercial and securities litigation.

85.     Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members. Among the questions of law and fact common to the Class are:

(a)     when Defendants became aware or should have been aware of the negative reports and analysts warnings concerning Sigma;

(b)     whether Defendants breached the Securities Lending Agreements by investing in the Sigma MTNs and/or maintaining their investment in the Sigma MTNs;

(c)     whether Defendants owed Class Members the obligation to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

21

(d)     whether Defendants breached their fiduciary duties to Class Members by investing in the Sigma MTNs and maintaining the investment in the Sigma MTNs;

(e)     whether Defendants owed Class Members a duty of care to act so as not to cause harm to another;

(f)     whether Defendants acted negligently toward Class Members by investing in the Sigma MTNs and maintaining the investment in the Sigma MTNs; and

(g)     to what extent Class Members have sustained damages and the proper measure of damages.

86.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. There will be no difficulty in the management of this action as a class action.

## VI.     CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty

87.     Plaintiff restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

88.     Defendants owed fiduciary duties to Plaintiff and all other Class Members by virtue of the terms of the Securities Lending Agreements and/or the nature of their relationship with Plaintiff and all other Class Members.

89.     These fiduciary duties required Defendants to discharge their obligations with respect to Plaintiff and all Class Members (a) solely in the interest of Class Members, (b) for the exclusive purpose of providing benefits to Class Members, (c) with

22

the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (d) in accordance with the documents and instruments governing its contract with Class Members.

90.    Defendants breached the fiduciary duties they owed to Plaintiff and all Class Members by, *inter alia*: (a) failing to conduct a complete, thorough, and careful investigation into the Sigma MTNs which, if conducted would have revealed, among other things, a substantial and unacceptable risk of under-collateralization that would leave Plaintiff and all other Class Members at risk of not recovering all principal invested; (b) imprudently investing the collateral received by Plaintiff and other Class Members in the Sigma MTNs which were inappropriate and unsuitable investments for the investment of the cash collateral and which did not comply with the Investment Guidelines; (c) imprudently failing to properly monitor the investments in the Sigma MTNs which, if prudently done, would have, among other things, revealed as early as January 2008 excessive risks of Sigma's inability to pay the MTNs as they matured; and (d) imprudently maintaining the investments in the Sigma MTNs after it Defendants became aware or should have become aware of analysts' warnings concerning Sigma, its dire financial condition, and its likely failure before the MTNs matured.

91.    Defendants' breach of their fiduciary duties was the direct, proximate and/or producing cause of damages to Plaintiff and all Class Members.

### COUNT II
### Negligence

92.    Plaintiff restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

23

93.     Defendants owed Plaintiff and all other Class Members the duties set forth in Count I, above, as well as the duty of ordinary care and skill to act so as to not cause harm to another. These duties arose by virtue of the terms of the Securities Lending Agreements and the nature of Defendants' relationships with Plaintiff and all other Class Members.

94.     Defendants breached these duties owed to Plaintiff and all other Class Members by, *inter alia*: (a) failing to conduct a complete, thorough, and careful investigation into the Sigma MTNs which, if conducted, would have revealed, among other things, a substantial and unacceptable risk of under-collateralization that would leave Plaintiff and all other Class Members at risk of not recovering all principal invested; (b) imprudently investing the collateral received by Plaintiff and other Class Members in the Sigma MTNs which were inappropriate and unsuitable investments for the investment of the cash collateral and which did not comply with the Investment Guidelines; (c) imprudently failing to properly monitor the investments in the Sigma MTNs which, if prudently done, would have, among other things, revealed as early as January 2008 excessive risks of Sigma's inability to pay the MTNs as they matured; and (d) imprudently maintaining the investments in the Sigma MTNs after Defendants became aware or should have become aware of analysts warnings concerning Sigma, its dire financial condition, and its likely failure before the MTNs matured.

95.     Defendants' breach of this duty was the direct, proximate and/or producing cause of injury and damages to Plaintiff and all Class Members.

## COUNT III
## Breach of Contract

96.     Plaintiff restates and incorporates the allegations contained in each paragraph above as though fully set forth herein.

97.     During the relevant times to the allegations made herein, Defendants were parties to valid and existing Securities Lending Agreements with Class Members, including Plaintiff.

98.     The Securities Lending Agreements required, *inter alia*: (a) compliance with the Investment Guidelines (including safeguarding principal, maintaining adequate liquidity, and optimizing return); (b) Defendants to prudently discharge their fiduciary duties to Plaintiff and all other Class Members; (c) Defendants to act non-negligently with respect to Plaintiff and all Class Members; and (d) Defendants to assume liability for losses resulting from their negligence in the Securities Lending Program.

99.     Defendants breached the Securities Lending Agreement for the reasons stated in Counts I and II above and for refusing to assume the losses of Plaintiffs and Class Members arising from their negligence in the Securities Lending Program. All conditions precedent, if any, have been met.

100.    Defendants' breaches were a direct, proximate and/or producing result of Plaintiff's and all other Class Members' damages.

## VII.   JURY DEMAND

101.    Plaintiff demands a trial by jury as to all issues so triable.

## VIII.  PRAYER FOR RELIEF

102.    FOR THE FOREGOING REASONS, Plaintiff, individually on behalf of the Class, respectfully requests that the Court certify this action as a class action and enter

a judgment against Defendants, jointly and severally, in favor of the Class, awarding (a) money damages to Plaintiff and the other Class Members to fully compensate them for losses sustained as a direct, proximate, and producing cause of Defendants' breach of fiduciary duty, negligence, and breach of contract; (b) disgorgement of fees earned by Defendants pursuant to its Securities Lending Agreements with Plaintiff and the other Class Members; (c) pre-judgment and post-judgment interest at the maximum allowable rates; (d) attorneys' fees and costs; and (e) such other and further relief as the Court deems just and proper.

Dated: December 19, 2008

Respectfully Submitted,

**ROBINETT & MURPHY**
624 South Boston Ave., Suite 900
Tulsa, Oklahoma 74119
Telephone (918) 592-3699
Facsimile (918) 592-0963

Lawrence R. Murphy, Jr.
  Oklahoma Bar No. 17681
Pansy Moore-Shrier
  Oklahoma Bar No.  20289

*Liaison Counsel for Plaintiff and the*
*Proposed Class*


**NIX, PATTERSON & ROACH, LLP**
205 Linda Drive
Daingerfield, TX 75638
Telephone 903-645-7333
Facsimile 903-645-4415

Bradley E. Beckworth (to be admitted)
  Oklahoma Bar No. 19982
Jeffrey J. Angelovich (to be admitted)
  Oklahoma Bar No. 19981
Susan Whatley (to be admitted)
  Texas Bar No. 24047420
Brad E. Seidel (to be admitted)
  Texas Bar No. 24008008

*Lead Counsel for Plaintiff and the*
*Proposed Class*

**LITTLE, LITTLE, LITTLE,
WINDEL, OLIVER, LANDGRAF &
GALLAGHER, PLLC**
202 West Lillie Blvd.
P.O. Box 618
Madill OK 73446
Telephone 580-795-3397
Facsimile 580-795-5072

Dan Little
  Oklahoma Bar No. 5462

*Of Counsel*

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone (610) 667-7706
Facsimile (610) 667-7056

Joseph H. Meltzer (to be admitted)
  Pennsylvania Bar No. 80136
Sean M. Handler (to be admitted)
  Pennsylvania Bar No. 86659
Sharan Nirmul (to be admitted)
  Pennsylvania Bar No. 90751

*Of Counsel*